**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COSTAR GROUP, INC.
1331 L Street NW
Washington, D.C. 20005

and

COSTAR REALTY INFORMATION, INC.,
1331 L Street NW
Washington, D.C. 20005

      Plaintiffs,

    v.

HAPPENING TECHNOLOGY, INC.
7272 Wisconsin Avenue, Suite 900
Bethesda, MD 20814

GUY WOLCOTT
9503 Page Avenue
Bethesda, MD 20814

JOHN MAZUR
5500 Bradely Boulevard
Bethesda, MD 20814

THOMAS GOFF
920 Greengate Court
Manassas, VA 20110

and

JEFFREY REPANICH
1701 16th Street NW, Apt 434
Washington, D.C. 20009

      Defendants.

Case No. _____

**<u>COMPLAINT</u>**

Plaintiffs CoStar Group, Inc. ("CGI") and CoStar Realty Information, Inc. ("CRI") (collectively, "CoStar" or the "Company"), by and through their undersigned counsel, for their complaint against Defendants Happening Technology, Inc. ("Happening Technology") and Guy Wolcott, John Mazur, Thomas Goff, and Jeffrey Repanich (collectively, the "Former Employees") hereby allege with knowledge as to themselves and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is an action for injunctive and monetary relief arising from Defendants' misappropriation of CoStar's trade secrets and confidential information, the Former Employees' breach of the Terms and Conditions of Employment Agreement that each of them entered into with CRI in 2020 (each an "Agreement" and together, the "Agreements"), and Happening Technology's tortious interference with those Agreements.   True and correct copies of the Agreements and any amendments, as applicable, are attached as Exhibits A (Wolcott Agreement and Amendment), B (Mazur Agreement), C (Goff Agreement), and D (Repanich Agreement).

2.      CoStar is the nation's leading provider of commercial and residential real estate data, analytics, and online property marketplaces.   To support that business and give it a competitive advantage over other companies in the industry, CoStar has developed a proprietary data transfer platform called CoStar Sync.

3.      CoStar Sync is a novel and proprietary platform that allows data from locally stored databases to be rapidly and efficiently accessed through CoStar's multiple product platforms, such as Homes.com and Apartments.com.   This provides CoStar with a major competitive advantage over its competitors by creating superior products and substantially reducing CoStar's operating costs.   If, for example, information about certain real estate is modified on one product, CoStar Sync will ensure that the update is almost immediately reflected in and effectively distributed

through all of Costar's other products.  Due to its ability to target heterogeneous repositories, it allows CoStar's end-user products to retrieve data extremely quickly, allowing users to get search results faster than CoStar's competitors.  CoStar began developing CoStar Sync in 2021 and put CoStar Sync into production in May 2022.

4.     CoStar Sync solves a problem that plagues many data-heavy companies—how to enable numerous end-users to rapidly access large volumes of data from multiple "source of truth" repositories while ensuring that data is accurate and uniform (*i.e.*, that any modifications to the data made through any one source are "pushed" out to all sources where that data resides).  This allows CoStar to offer a superior product and substantially reduces its operating costs.

5.     In December 2020, CoStar acquired Homesnap, Inc. ("Homesnap") in a $250 million purchase.  As part of the purchase price, CoStar paid Mazur and Wolcott each $7.8 million. At this time or shortly beforehand, the Former Employees, who were all previously employed by Homesnap, began working for CRI.  Throughout the entirety of their tenure at CRI until their respective separations from CRI in late 2022 (Goff and Repanich) and early 2023 (Mazur and Wolcott) respectively, each Former Employee was either involved in the development of CoStar Sync or had access to substantial confidential and proprietary information regarding CoStar Sync and its development.

6.     At the time of their departures from CoStar, none of the Former Employees informed CoStar management of their future plans or where they would be working next, even when asked.  As CoStar has recently discovered, however, all of the Former Employees eventually formed or joined Happening Technology, a new company that was incorporated in January 2023 with Wolcott as CEO, and did so with the apparent intention of repurposing the proprietary and

confidential information they had access to and worked with at CoStar so that Happening Technology could offer competitive technology and services to CoStar's competitors.

7.      In an apparent effort to convince CoStar to bless their misappropriation and misuse of CoStar confidential information and trade secrets, Wolcott sought to present Happening Technology's product to CoStar and convince it to enter into agreements with Happening Technology.  On July 27, 2023, Wolcott  went to CoStar's headquarters in Washington, D.C. and presented a business pitch to Frank Simuro, CoStar's Chief Technology Officer, and Adam Kleiner, CoStar's Vice President of Software Development.  Wolcott introduced his new company, Happening Technology, and presented Happening Technology's data transfer platform.  Wolcott later indicated via email that Happening Technology was "having a similar conversation with Black Knight," one of CoStar's largest competitors in the real estate data and analytics industry.

8.      Based on Wolcott's presentation, Simuro and Kleiner realized that Happening Technology's product was developed using CoStar's trade secrets and confidential information, including the CoStar Sync technology that the Former Employees worked on or had access to during their employment at CoStar.  Indeed, in his presentation, Wolcott claimed many of CoStar's trade secrets as if they were conceived of and owned by Happening Technology.

9.      In the respective Agreements that they entered following the Homesnap acquisition, each Former Employee had committed to protect and not to disclose CoStar's confidential information and agreed that all inventions, trade secrets, creations, ideas, and other intellectual property were property of CoStar.  They also agreed not to solicit or recruit CoStar employees for other causes.  Notwithstanding their contractual commitments to CoStar, the Former Employees breached their Agreements by recruiting each other to start a new company to create a

product using CoStar's stolen confidential information, and then profit from that theft by marketing the product to CoStar's competitors.

10.     Following the presentation, CoStar's management engaged outside counsel to investigate the Defendants' conduct and communicate directly with the Defendants and their subsequently identified outside counsel to discuss CoStar's concerns.  The correspondence with Defendants and their counsel were insufficient to alleviate CoStar's concerns and, thus, CoStar had no choice but to file this action.

11.     CoStar has been severely and irreparably harmed, and will continue to be harmed, by Defendants' misappropriation of its trade secrets.  CoStar—through considerable expense and time—has built a unique, proprietary data transfer system for internal use that gives it a competitive advantage over its competitors.  By marketing a copycat version of that technology to CoStar's competitors, Defendants are undermining that competitive advantage.

12.     In their Agreements, each Former Employee stipulated that if they were to breach any of the obligations therein, the damage to CoStar would be irreparable and the Company would be entitled to preliminary and permanent injunctive relief enjoining such breach without having to post bond or other security.

13.     Through this Complaint, CoStar seeks preliminary and permanent injunctive relief enjoining Happening Technology from further misappropriation of its trade secrets and tortious interference of the Agreements and enjoining the Former Employees from further misuse of CoStar's confidential information and breaches of the Agreements.  CoStar additionally seeks the monetary damages that it has suffered as a result of Defendants' wrongful conduct and its attorneys' fees and costs to pursue this action.

## PARTIES

14.     Plaintiff CGI is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Washington, D.C.

15.     Plaintiff CRI is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Washington, D.C.  CRI is a wholly-owned subsidiary of CGI.

16.     Defendant Happening Technology, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Bethesda, Maryland.

17.     Defendant Guy Wolcott is an individual who, upon information and belief, lives in Bethesda, Maryland.  Wolcott previously worked at CRI as Senior Vice President of Product Strategy in CRI's residential real estate division ("Residential") and is currently the Chief Executive Officer and a Director of Happening Technology.

18.     Defendant John Mazur is an individual who, upon information and belief, lives in Bethesda, Maryland.  Mazur previously worked at CRI as President of Residential and is currently a Director of Happening Technology.

19.     Defendant Thomas Goff is an individual who, upon information and belief, lives in Manassas, Virginia.  Goff previously worked at CRI as Vice President of Software Engineering, Residential and is currently an Executive Officer of Happening Technology.

20.     Defendant Jeffrey Repanich is an individual who, upon information and belief, lives in Washington, D.C.  Repanich previously worked at CRI as a Principal Engineer and is currently an Executive Officer of Happening Technology.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) over claims arising under federal law.  The Court also has supplemental jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the federal law claims that they form part of the same case or controversy.

22.     This Court has personal jurisdiction over the Former Employees pursuant to the Section 5.10(d) of the Agreements, which provides in relevant part: "the parties agree that any proceeding for injunctive relief shall be brought exclusively in the Superior Court of the District of Columbia or in the United States District Court for the District of Columbia and the parties agree to the jurisdiction thereof."

23.     This Court has personal jurisdiction over Happening Technology pursuant to D.C. Code § 13-423 because this claim for relief arises from Happening Technology's conduct within the District of Columbia, which conduct has caused tortious injury in the District of Columbia.

24.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to CoStar's claims occurred in this judicial district.

## FACTUAL BACKGROUND

25.     CoStar is the leading provider of online real estate information, analytics, and marketplace services for the residential and commercial real estate property markets.  CoStar has the most comprehensive database of real estate data throughout the United States and owns and operates a number of online products, including Homesnap, Homes.com, and Apartments.com for residential real estate and LoopNet, CoStar, and Ten-X for commercial real estate.

26.     On information and belief, in or around 2012, Wolcott founded Homesnap. Homesnap operated an online platform that provided agent tools, agent marketing, and property listing exposure.  In December 2020, CRI acquired Homesnap in a $250 million purchase.  The

following year, CRI acquired Homes.com in May 2021.  Wolcott and the other Former Employees began working for CRI following the Homesnap acquisition and signed the Agreements in conjunction with such employment.

27.     CoStar's products for both residential and commercial real estate receive data from different sources, such as CoStar researchers, and third-party sources, such as Multiple Listing Service (MLS) real estate listings.  After CoStar acquired Homesnap (and, later, Homes.com), it needed to ingest the residential real estate data feeds into CoStar's data repositories, and pursuant to its agreements, deliver that data to end-users.

28.     Technology companies that rely on large databases routinely face challenges in integrating and updating large volumes of data and making it all available in varying formats to a large volume of end users in near real-time across multiple products.  CoStar is no exception as CoStar's users expect CoStar's products to quickly respond to their searches with the desired results and that the resulting data be accurate and updated in real time.  Therefore, it is critically important to CoStar's business to streamline the movement of data to its end-user products.  To solve that challenge and create a competitive advantage, CoStar has invested considerable time and resources into developing a near real-time data transfer platform called CoStar Sync.

A.     **CoStar's Development of CoStar Sync**

29.     Historically, CoStar largely relied on a data replication model used by many companies, in which a database is repeatedly duplicated to create copies of the data for various products to access.  CoStar's senior technical leadership team has long understood that CoStar would eventually need to solve the problems caused by such data replication.  With the acquisition of Homesnap and CoStar's decision to expand its footprint in the residential real estate data business, CoStar's leadership determined the time was ripe for deploying a more scalable and faster solution.

30.     CoStar's Chief Technology Officer, Frank Simuro, then instructed the CoStar development team to improve CoStar's data transfer platform.  As a result, CoStar developed what eventually became CoStar Sync.

31.     CoStar completed the architecture design for CoStar Sync in July 2021. Development continued through a series of meetings in Richmond, Virginia, and Washington, D.C. through September 2021.  Wolcott, Goff, and Repanich were core participants in those meetings, along with CoStar's CTO and other senior members of the technical team.  CoStar ultimately launched CoStar Sync into production in May 2022.  In August 2022, CoStar then launched a version of Homes.com that was powered by CoStar Sync.

32.     CoStar has invested significant resources to develop CoStar Sync, relying on a core group of 14 of its most senior and strongest software developers overseen by Frank Simuro to create and build it over multiple years.  Ultimately, as CoStar transitions away from its legacy platforms, CoStar Sync will be the backbone of CoStar's multibillion dollar data repositories.

33.     Unlike the traditional data replication model, CoStar Sync is a novel, proprietary data transfer platform that enables near real-time data transfer with the aid of a cloud-based system. CoStar Sync allows CoStar to increase efficiency, reduce costs of data storage and manual developer labor, and provide a higher quality product for its customers.

34.     This increased speed and agility allows CoStar to host simultaneous, high-volume traffic on CoStar's websites, enabling thousands (or more) customers to access up-to-the minute updated listings and real estate data at the same time without any delay.

**B.     The Former Employees Had Access to CoStar's Trade Secrets and Confidential Information Prior to Their Departure**

35.     Following CoStar's acquisition of Homesnap in December 2020, the Former Employees, who had all previously been employed by Homesnap, became employees of CRI.  CRI

entered the Agreements with Wolcott and Mazur on November 20, 2020 (*see* Exs. A and B) and with Goff and Repanich on December 22, 2020 (*see* Exs. C and D).  In discussions with the Former Employees regarding how to ingest Homesnap's data into CoStar's databases after the acquisition, it became clear that the Former Employees did not grasp the challenges facing CoStar with respect to data transfer.  They merely focused on the source of the data (sometimes referred to as the "source of truth"), not challenges associated with updating and delivering that data to multiple consumer-facing products.  Their proposed "solution," known as "event sourcing"—a well-known approach to data transfer—would not have solved CoStar's need to update and access all of its data through CoStar's various products quickly and efficiently.  In other words, the Former Employees were not looking at the correct problem, and therefore their proposed solution would not have fixed it.  Instead, as detailed above, CoStar was working to develop its own solution internally—CoStar Sync. And it was only after the Former Employees began working with the CoStar personnel on the CoStar Sync project that they appreciated the problem, and the benefits associated with CoStar's solution.

36.    The Former Employees subsequently had access to CoStar Sync and highly confidential information and trade secrets relating to its development.

37.    Repanich worked as a Principal Engineer at CRI and was involved with the original planning for CoStar Sync and determining how it could power the new residential marketplace offerings.  Repanich attended strategy meetings and received multiple confidential presentations regarding CoStar Sync, including a noteworthy design meeting in September 2021 with Andy Ventura, Adam Kleiner, and others, where the leadership team outlined the CoStar Sync development goals. *See* Exhibit E (Sept. 15, 2021 Outlook meeting re "ENS Sync Up").  Repanich also led a meeting in October 2021 with CoStar Sync's main developers to walk through how to

locally debug CoStar Sync.  *See* Exhibit F (Oct. 4, 2021 Outlook meeting re "CoStar Sync Local Debug").  Shortly before he resigned, CoStar asked Repanich to take a leading role on the implementation of CoStar Sync, but he declined that offer (presumably due to his intention to resign and join Happening Technology).

38.     Repanich's last day at CRI was October 31, 2022.  When CoStar asked Repanich why he was leaving CoStar and where he was going next, he stated that he was not leaving for any specific opportunity.  Repanich is now an executive officer of Happening Technology.  *See* Exhibit G (SEC Form D) at 2.

39.     Goff served as CRI's Vice President of Software Engineering, Residential. Repanich reported to Goff.  Goff worked closely with Adam Kleiner, CoStar's Vice President of Software Development, and Andy Ventura, CoStar's Vice President, Enterprise Solution Architect, on the implementation of CoStar Sync.  He engaged in highly strategic discussions about the challenges and solutions for designing a new data transfer platform.  Goff was directly involved with integrating Homesnap data using CoStar Sync in its early stages and was privy to confidential presentations and documents regarding CoStar Sync.  Goff's work required that he understand how CoStar Sync worked and how it would use Homesnap data.

40.     Goff's last day at CRI was October 31, 2022—the same day as Repanich.  In his exit interview, Goff was asked why he was leaving and about any intended alternate employment, but he made no mention of Happening Technology or his intention to start a new company with other former CoStar employees.   Goff is now serving as an executive officer of Happening Technology.  *See* Ex. G at 1-2.

41.     Most recently, Wolcott worked for CRI as Senior Vice President of Product Strategy.  Goff reported to Wolcott.  Wolcott was responsible for providing strategic guidance on

the integration of Homesnap into Homes.com and the Company's residential platform as a whole. Accordingly, Wolcott attended several meetings with the core CoStar Sync team from June to September 2021 to develop the framework of how CoStar Sync would operate.

42.     In August 2022, Wolcott expressed an intent to leave to develop an unidentified project of his own, but because he was central to the integration of Homesnap into Homes.com, CoStar asked him to stay.  He agreed but conditioned his continued employment on an amendment to the terms of his Agreement with CRI that would allow him to develop and reserve ownership of his own newly created intellectual property.  However, the amendment made clear that any resulting intellectual property could not relate to CoStar's business, must be conceived and developed on Wolcott's own time, and could not use CoStar's resources or trade secrets.  *See* Ex. A at 13.  Thus, any data transfer technology he developed while working at CoStar would remain CoStar's IP.

43.     Wolcott subsequently departed CRI on April 10, 2023.  He is now CEO and a Director of Happening Technology.  *See* Ex. G at 1.

44.     Mazur was President of Residential for CRI and oversaw both Homesnap and Homes.com.  Wolcott reported to Mazur until the end of November 2022.  Mazur worked as President of Residential until he left CRI on January 30, 2023.  Mazur is currently a Director of Happening Technology.  *See* Ex. G at 2.

45.     In summary, and as described above, the Former Employees were all involved in CoStar Sync development while employed at CoStar and were all connected by a chain of command—Repanich reported to Goff, Goff reported to Wolcott, who, in turn reported to Mazur. As a result, each of them had access to the strategy and design information, source code and programming, and presentations and business records related to CoStar Sync.

C.     The Former Employees' Terms of Employment

46.     As stated above, when CRI hired the Former Employees, they each executed a

Terms and Conditions of Employment Agreement.  *See, e.g.*, Exs. A-D.  In Section 2.1(a) of the

Agreements, each Former Employee acknowledged that he "has and will have access to and will

come into contact and learn various technical and non-technical trade secrets and other confidential

information, which are the property of the Company[1] or any predecessor (collectively, the

'Confidential Information')[2]."  Exs. A-D at 2.  In Section 2.1(b), each Former Employee agreed

that he would not "directly or indirectly: (i) disclose or divulge any Confidential Information to

any person, entity, firm, or company, unless compelled by a validly issued subpoena or court order;

or (ii) use any Confidential Information in any manner other than to perform his or her employment

for CRI."  *Id.* at 3.

47.     **Confidentiality.**  Pursuant to Section 3.1, each Former Employee covenanted and

agreed that:

> [A]ll inventions, improvements, products, designs, specifications,
> trademarks, service marks, discoveries, formulae, processes, software or
> computer programs, modifications of software or computer programs, data
> processing systems, analyses, techniques, trade secrets, creations, ideas,
> work product or contributions thereto, and any other intellectual property,
> regardless of whether patented, registered or otherwise protected or
> protectable, and regardless of whether containing or constituting trade
> secrets or Confidential Information as defined in this Agreement (referred
> to collectively as "Intellectual Property"), that were conceived, developed
> or made by [him] during the period of [his] employment by the Company
> or any predecessor, (or otherwise resulting from or relating to any services

---

[1] The Agreement defines "the Company" as "CGI, CRI, and the rest of CGI's wholly owned
subsidiaries (either directly or indirectly) incorporated in the United States."  Exs. A-D at 1.

[2] "Confidential Information" is defined as "various technical and non-technical trade secrets and
other confidential information, which are the property of the Company or any predecessor"
including but not limited to: "processes, methods, techniques, applications and procedures,
including without limitation all formulae, algorithms and models, used by the Company or any
predecessor (A) in calculating, creating or deriving products and services and (B) for search engine
optimization or management[.]"  Exs. A-D at 2.

performed by [him] for or on behalf of the Company or any predecessor), including Intellectual Property related to the Company's business and any other business in which the Company was engaged prior to or as of the date of termination of [his] employment with the Company (the "Proprietary Interests"), shall belong to and be the property of the Company.

*Id.* at 6 (emphasis added).

48.     **Non-solicitation.**   Pursuant to Section 2.3 of the Agreements, each Former Employee covenanted:

[He] will not, during the term of employment with CRI and for an additional period of one (1) year after [his] employment with CRI is terminated for any reason, whether voluntarily or involuntarily, for any reason whatsoever, directly or indirectly, individually or on behalf of others, aid or endeavor to solicit or induce any other employee or consultant of the Company to leave the employment or service of the Company.

*Id.*  at 4.  This non-solicitation restriction is limited to those employees with whom the Former Employee came into contact during the last two (2) years of his employment with CRI.

49.     In Section 4, each Former Employee acknowledged that "any breach of [the] Agreement will result in irreparable and continuing harm to the Company, for which money damages may not provide adequate relief."  *Id.* at 6.  Furthermore, the Former Employees stipulated that "in the event of any breach or anticipatory breach of [the] Agreement by [the Former Employee] . . . the parties agree that the Company shall be entitled to the following particular forms of relief as a result of such breach, in addition to any remedies otherwise available to it at law or in equity: (a) injunctions, both preliminary and permanent, enjoining or restraining such breach or anticipatory breach, and [the Former Employee] hereby consents to the issuance thereof forthwith and without bond by any court of competent jurisdiction; and (b) recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company to defend or enforce the provisions of [the] Agreement."  *Id.*

50.     To further protect CoStar's interests, the Agreements provide in Section 5.5 that "the provisions contained in [the] Agreement shall survive any termination of [the Former Employees'] employment with CRI."  *Id.* at 8.  Each of the Former Employees was reminded of their continuing obligations under the Agreements at the time of their departure from the Company.

### D.     The Former Employees Have Used and Disclosed CoStar's Trade Secrets and Confidential Information at Happening Technology

51.     Despite their ongoing confidentiality obligations to CoStar, the Former Employees have formed and developed Happening Technology, which is now marketing a data transfer platform that mirrors CoStar Sync's functionality and design.

52.     Happening Technology filed its incorporation papers on January 5, 2023, two months after Repanich and Goff left CRI, the same month Mazur left CRI, and three months ***before*** Wolcott departed the Company.  *See* Exhibit H (Happening Technology Certificate of Formation). On June 12, 2023, Happening Technology filed a Form D with the U.S. Securities and Exchange Commission, listing Wolcott, Mazur, Goff, and Repanich as Executive Officers and/or Directors. *See* Ex. G at 1-2.  The Form D also indicates that Happening Technology had an equity offering of $2,692,051 with 21 investors.  *See id.* at 4-5.

53.     Upon information and belief, the Former Employees and Happening Technology relied upon and used CoStar's confidential information and trade secrets to develop its platform. Through such use of CoStar's trade secrets and confidential information, Happening Technology managed to "develop" this revolutionary technology in only ***six months***—a fraction of the time it took CoStar to develop the technology in the first instance.  Indeed, absent CoStar's confidential information and trade secrets, Happening Technology would not even have appreciated the data transfer problem that its platform now claims to address, much less have identified and developed CoStar's unique solution to that problem.

54.    In June 2023, Wolcott emailed Frank Simuro about a new startup company called Happening Technology and asked to get together to discuss a proposal on working together with CoStar.  Frank Simuro responded on July 19 and set up a meeting for Wolcott to pitch Happening Technology's offering the following week.

55.    On July 27, 2023, Wolcott visited CoStar's headquarters in Washington, D.C. and met with Frank Simuro and Adam Kleiner regarding Happening Technology's data transfer platform.  The presentation, which featured a demonstration of Happening Technology's offering, lasted approximately 1.5 hours and featured a PowerPoint detailing Happening Technology's purported platform and demo.

56.    Through Wolcott's presentation and subsequent information learned about Happening Technology's product, CoStar has concluded that Happening Technology copied CoStar Sync and is using CoStar's confidential information and trade secrets to develop its own product.

57.    CoStar's concerns were amplified when it learned that Wolcott and Happening Technology had falsely claimed to an investor that Happening Technology was working with CoStar to develop its platform.

58.    The confidentiality of CoStar Sync and the competitive advantage it provides is hugely valuable to CoStar and its ability to outperform other real estate data businesses.  CoStar Sync provides this advantage through its creation of more effective and efficient data transfer mechanism, allowing for seamless and rapid access to large volumes of data from different sources by end users.  CoStar has also greatly reduced its operational costs by increasing the efficiency of its cross-platform data sharing with CoStar Sync.  CoStar developed this trade secret through a substantial investment of time and money.  CoStar will be irreparably harmed if other competitors

are able to leverage CoStar's trade secrets and proprietary technology to improve their offerings by simply purchasing Happening Technology's stolen platform.

59.     Upon information and belief, Happening Technology has already begun marketing its own data transfer platform to CoStar's competitors in the real estate industry.  On August 2, 2023, Wolcott informed Frank Simuro that he was also pitching Happening Technology's product to Black Knight.  Black Knight is one of CoStar's largest competitors in the real estate data and analytics industry. Without preliminary and permanent injunctive relief to prevent the further misappropriation of its trade secrets, Defendants will be free to continue to market and disclose CoStar's trade secrets to its competitors, rendering the harm to CoStar impossible to cure.

60.     On August 29, 2023, CoStar, through its counsel, informed both the Former Employees and Happening Technology that the Former Employees had breached their respective Agreements with CoStar and demanded that they cease and desist from any further misuse or disclosure of CoStar's trade secrets and confidential information.

61.     On September 1, 2023, counsel for Defendants responded with a blanket denial of CoStar's allegations, without providing a substantive response or explanation for how Happening Technology was able to develop its product so quickly.  Five days later, on September 6, 2023, Defendants' counsel produced documents that Wolcott, Mazur, and Goff improperly retained from their employment at Homesnap and CoStar, including photos of whiteboard images with strategic planning and development models related to data transfer technology.

62.     Both Defendants' September 1 and September 6 responses failed to provide any explanation for their counsel's claim that they independently came up with Happening Technology's product or that the product was distinct from CoStar Sync.

63.     In light of Defendants' misappropriation of CoStar's trade secrets and confidential information and their inability to explain how Happening Technology independently developed its product, CoStar had no choice but to file this action and seek relief from the Court.

**COUNT I**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**(Asserted against all Defendants)**

64.     Plaintiffs repeat and re-allege Paragraphs 1 through 63 as if fully set forth herein.

65.     CoStar's confidential information and trade secrets regarding CoStar Sync are critical to its business operations and provide it a substantial competitive advantage.

66.     CoStar's confidential information associated with the development and operation of CoStar Sync constitutes trade secrets under the Defend Trade Secrets Act.  CoStar's trade secrets are related to its products and services that are used in interstate commerce.  Disclosure and unauthorized use of CoStar's trade secrets undermines CoStar's position in the highly competitive real estate data and analytics industry.

67.     CoStar has taken significant steps to protect its trade secrets, including implementing a number of security measures and policies.

68.     The Former Employees had access to and knowledge of CoStar's confidential information and trade secrets involved with CoStar Sync by virtue of their employment with CRI.

69.     Upon information and belief, Happening Technology and each of the Former Employees (Defendants Wolcott, Mazur, Goff, and Repanich), misappropriated, retained, misused, disclosed, and exploited CoStar's confidential information and trade secrets without authorization, including but not limited to their knowledge of CoStar Sync and the software engineering and development underlying CoStar Sync.  This conduct constitutes an actual misappropriation and misuse of CoStar's trade secret information in violation of the DTSA.

70.    If left unaddressed, the Former Employees will continue to misappropriate, retain, use, disclose, and exploit CoStar's confidential information and trade secrets on behalf of Happening Technology to continue to develop and market a data transfer platform like CoStar Sync and further damage CoStar.

71.    CoStar did not expressly or impliedly consent to Defendants' misappropriation or use of its confidential information and trade secrets.

72.    Upon information and belief, Defendants' misappropriation is willful and malicious.

73.    Unless enjoined by this Court, Defendants will continue to use and misappropriate CoStar's trade secrets and will continue to cause CoStar to suffer irreparable harm, for which it has no adequate remedy at law.

74.    Defendants' actions have already damaged and will continue to damage CoStar in an amount to be determined at trial.

75.    Under 18 U.S.C. § 1836, CoStar is entitled to injunctive relief, compensatory damages, damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss, exemplary damages, an award of reasonable attorneys' fees, and/or other appropriate relief.

## COUNT II
## VIOLATION OF THE D.C. UNIFORM TRADE SECRETS ACT
### (Asserted against all Defendants)

76.    Plaintiffs repeat and re-allege Paragraphs 1 through 75 as if fully set forth herein.

77.    CoStar's confidential information related to CoStar Sync constitute trade secrets under the District of Columbia Uniform Trade Secrets Act ("D.C. UTSA"), D.C. Code §§ 36-401 − 36-410 (2011).  The design and functionality of CoStar Sync is not generally known and has

independent economic value.   Disclosure and unauthorized use of CoStar's trade secrets undermines CoStar's position in the highly competitive real estate data and analytics industry.

78.     As alleged above, CoStar has taken significant steps to protect its trade secrets.

79.     Upon information and belief, Happening Technology and each of the Former Employees (Defendants Wolcott, Mazur, Goff, and Repanich), misappropriated, retained, misused, disclosed, and exploited CoStar's confidential information and trade secrets without authorization, including but not limited to their knowledge of CoStar Sync and the software engineering and development underlying CoStar Sync.  This conduct constitutes misappropriation and misuse of CoStar's trade secret information in violation of the D.C. UTSA.

80.     If left unaddressed, the Former Employees will continue to misappropriate, retain, use, disclose, and exploit CoStar's confidential information and trade secrets on behalf of Happening Technology to continue to develop and market a data transfer platform like CoStar Sync.

81.     CoStar did not expressly or impliedly consent to Defendants' misappropriation or use of its confidential information and trade secrets.

82.     Upon information and belief, Defendants' misappropriation is willful and malicious.

83.     Unless enjoined by this Court, Defendants will continue to use and misappropriate CoStar's trade secrets and will cause and continue to cause CoStar to suffer irreparable harm, for which it has no adequate remedy at law.

84.     Defendants' actions have already damaged and will continue to damage CoStar in an amount to be determined at trial.

85.     Under D.C. Code §§ 36-402, 36-403, and 36-404, CoStar is entitled to injunctive relief, compensatory damages, damages equal to Defendants' unjust enrichment, exemplary damages, an award of reasonable attorneys' fees, and other appropriate relief.

**COUNT III**
**BREACH OF CONTRACT (CONFIDENTIALITY)**
**(Asserted against the Former Employees)**

86.     Plaintiffs repeat and re-allege Paragraphs 1 through 85 as if fully set forth herein.

87.     The Agreements constitute valid and binding legal contracts between each of the Former Employees and CoStar.  Moreover, the confidentiality obligations therein are reasonably necessary to protect CoStar's confidential information and trade secrets.

88.     Each of the Former Employees agreed that he would not "directly or indirectly: (i) disclose or divulge any Confidential Information to any person, entity, firm, or company, unless compelled by a validly issued subpoena or court order; or (ii) use any Confidential Information in any manner other than to perform his or her employment for CRI."  Exs. A-D at 3.

89.     The Former Employees materially breached the Agreements by misusing and disclosing CoStar's trade secrets and confidential information regarding CoStar Sync in violation of Section 2.1(b) of the Agreements.  Upon information and belief, the Former Employees have misused and disclosed CoStar's confidential information to Happening Technology and its employees to develop Happening Technology's data transfer platform.

90.     As they stipulated in Section 4 of the Agreements, the Former Employees' breaches have proximately caused and will continue to cause "irreparable and continuing harm to the Company, for which money damages may not provide adequate relief."  *Id.* at 7.  The Former Employees have harmed CoStar's reputation and competitive advantage in the real estate industry and will continue to harm CoStar unless and until their conduct is enjoined by the Court.  *See id.* at 7.

91.     Moreover, as a result of the Former Employees' breach, CoStar has suffered and will continue to suffer substantial monetary damages as a result of Happening Technology's marketing and sale of its data transfer platform to CoStar's competitors and its disclosure and use of CoStar's confidential and trade secret information.  CoStar is entitled to recover such damages in an amount to be proven at trial.

### COUNT IV
### BREACH OF CONTRACT (NON-SOLICITATION)
**(Asserted against the Former Employees)**

92.     Plaintiffs repeat and re-allege Paragraphs 1 through 91 as if fully set forth herein.

93.     The Agreements constitute valid and binding legal contracts between each of the Former Employees and CoStar.  Moreover, the non-solicitation covenants therein are reasonably necessary to protect CoStar's confidential information and trade secrets.

94.     Each of the Former Employees agreed that he would not he "[would] not, during the term of employment with CRI and for an additional period of one (1) year after [his] employment with CRI is terminated for any reason, whether voluntarily or involuntarily, for any reason whatsoever, directly or indirectly, individually or on behalf of others, aid or endeavor to solicit or induce any other employee or consultant of the Company to leave the employment or service of the Company."  *Id.* at 4.

95.     The Former Employees left CoStar close in time and all now work for the same company, Happening Technology.  Given the foregoing, CoStar alleges upon information and belief that certain of the Defendants encouraged and recruited the others to begin this new endeavor.

96.     After departing CoStar—close in time to the formation of Happening Technology—each of the Former Employees are now executive officers for or serving as directors of Happening Technology.  Upon information and belief, certain of the Former Employees

materially breached the Agreements by soliciting CoStar employees, including but not limited the other Former Employees, to leave the Company and join Happening Technology, in violation of Section 2.3.  *See id.* at 4.

97.     As they stipulated in Section 4 of the Agreements, the Former Employees' breaches have proximately caused and will continue to cause "irreparable and continuing harm to the Company, for which money damages may not provide adequate relief."  *Id.* at 7.  The Former Employees have harmed CoStar's reputation and competitive advantage in the real estate industry, and will continue to harm CoStar unless and until their conduct is enjoined by the Court.  *See id.* at 7.

98.     Moreover, as a result of certain of the Former Employees' breach of their Agreements, CoStar has suffered substantial monetary damages caused by the other Former Employees' departure from CRI to Happening Technology.  CoStar is entitled to recover such damages in an amount to be proven at trial.

<u>**COUNT V**</u>
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Asserted against Happening Technology)**

99.     Plaintiffs repeat and re-allege Paragraphs 1 through 98 as if fully set forth herein.

100.     As alleged above, the Former Employees executed valid and enforcement confidentiality contractual obligations with CRI in the Agreements.

101.     Such Agreements also included non-solicitation obligations as alleged above.  *Id.* at 4.

102.     Happening Technology knew of the Former Employees' contractual obligations to CoStar.

103.     Happening Technology knowingly, intentionally, unjustifiably, and in bad faith, caused the Former Employees to breach and continue to breach their Agreements with CoStar by

inducing them to join Happening Technology, solicit other CoStar employees, and use and disclose CoStar Confidential Information for the benefit of Happening Technology.

104.    As described herein, Happening Technology has interfered with the Former Employees' contractual obligations to CoStar.

105.    Happening Technology's conduct was not privileged.

106.    Happening Technology's interference with the Former Employees' Agreements is causing and will continue to cause CoStar to suffer irreparable harm and damages, unless enjoined by this Court.

107.    Happening Technology's interference with the Former Employees' Agreements has also caused CoStar to suffer and will continue to cause CoStar to suffer monetary damages in an amount to be proven at trial.

## **PRAYER**

WHEREFORE, CoStar prays the Court:

A.    For a judgment in CoStar's favor and against Defendants on all claims herein;

B.    For an award of damages in an amount to be determined by the trier of fact, together with pre- and post-judgment interest thereon at the maximum legal rate;

C.    For preliminary injunctive relief in the form of an order:

    i.    Prohibiting Defendants from misappropriating, using, or disclosing to any person or entity CoStar's confidential information and trade secrets;

    ii.    Enjoining Defendants from marketing Happening Technology's data transfer platform and any other product incorporating CoStar's confidential information or trade secrets, including by removing from public access any materials discussing Happening Technology's data transfer platform;

    iii.    Requiring Defendants to immediately return and deliver to CoStar all CoStar documents, data or property;

    iv.    Prohibiting Defendants from possessing any original, copies, or summaries of CoStar's confidential information and trade secrets in any form, electronic or otherwise;

     v.        Requiring the Former Employees to abide by the terms of their Agreements; and

     vi.      Prohibiting Happening Technology from further tortiously interfering with the Former Employees' Agreements.

D.     For permanent injunctive relief in the form of an order that makes permanent the relief outlined in Section C, *supra,* and that:

     i.        Requires Defendants to engage a third-party forensic vendor to remediate any and all CoStar confidential information and trade secrets from any and all devices used by any Defendant for business purposes since October 31, 2022, and to allow CoStar to engage a separate third-party forensic vendor to audit and verify that all such trade secrets and confidential information were identified and removed; and

     ii.      Requires each Defendant to provide quarterly affidavits for a period of one year verifying that they have complied with their obligations to CoStar under the Order.

E.     For additional equitable relief in the form of an order requiring Happening Technology and the Former Employees to disgorge any and all monies, profits, compensation, or other amounts of benefits realized directly or indirectly as a result of or in connection with their wrongful conduct;

F.     For an award of CoStar's reasonable costs, expenses, and legal fees incurred in this action as provided in Section 4 of the Agreements and federal and state law;

G.     Awarding CoStar such other and further relief as this Court may deem proper, just, and equitable.

Dated: September 27, 2023

*/s/ Sarah M. Gragert*
Sarah M. Gragert (DC Bar No. 977907)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200
sarah.gragert@lw.com

Matthew W. Walch (*PHV petition pending*)
Russell D. Mangas (*PHV petition pending*)
Linda Qiu (*PHV petition pending*)
LATHAM & WATKINS LLP
330 N. Wabash Ave, Suite 2800
Chicago, IL 60611
(312) 876-7700

matthew.walch@lw.com
russell.mangas@lw.com
linda.qiu@lw.com

*Attorneys for Plaintiffs CoStar Group, Inc. and
CoStar Realty Information, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 27, 2023, I served the foregoing Complaint via hand

delivery and email on:

Jennifer Sklenar
Arnold & Porter LLP
601 Massachusetts Avenue, NW
Washington, D.C. 20001
jennifer.sklenar@arnoldporter.com


*/s/ Sarah M. Gragert*
Sarah M. Gragert